**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **Malikie Innovations Ltd. and Key Patent Innovations Ltd.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **Sercomm Corporation,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant.** | § | |
| | § | |

## COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND

Plaintiffs Malikie Innovations Ltd. ("Malikie") and Key Patent Innovations Ltd. ("KPI") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint for patent infringement and damages against Defendant Sercomm Corporation ("Sercomm" or "Defendant") and, in support, allege the following:

## PARTIES

1. Plaintiff Malikie is the successor-in-interest to a substantial patent portfolio created and procured over many years by BlackBerry Ltd., formerly known as Research in Motion Ltd., and its predecessor, subsidiary, and affiliated companies (collectively, "BlackBerry"). Malikie is an Irish entity duly organized and existing under the laws of Ireland. Malikie has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

2. Plaintiff KPI is the beneficiary of a trust pursuant to which Malikie owns, holds, and asserts the Asserted Patents (set forth below). KPI is an Irish entity duly organized and existing under the laws of Ireland. KPI has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

3. On information and belief, Defendant Sercomm Corporation, is a corporation duly organized and existing under the laws of Taiwan, with a principal place of business at 8F, No. 3-1, YuanQu St. (Nankang Software Park) Taipei 115, Taiwan.

4. On information and belief, Sercomm and/or its employees or officers direct and/or control the actions of its direct and indirect subsidiaries. On information and belief, Sercomm and/or its employees or officers direct and/or control the actions of these entities by, for example, inducing and contributing to the actions complained of herein. Sercomm and its affiliates are part of the same corporate structure and distribution chain for the making, importing, offering to sell, selling, and/or using of the accused devices in the United States, including in the State of Texas generally and this judicial district in particular.

5. Sercomm and its affiliates share management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused product lines and products involving related technologies.

6. Sercomm and its affiliates regularly contract with customers regarding products made for or on behalf of those customers.

7. Sercomm and its affiliates operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

## PATENTS IN SUIT

8. Malikie is the assignee of and owns all right and title to U.S. Patent Nos. 8,583,980 (the "'980 Patent"); RE48,212 (the "'212 Patent"); 7,453,856 (the "'856 Patent"); and 10,034,260 (the "'260 Patent") (collectively, the "Asserted Patents").

9. BlackBerry developed numerous innovative and diverse technologies, including groundbreaking inventions pertaining to mobile devices and related software and wireless

communications technology. Some of these groundbreaking inventions are described and claimed in certain of the Asserted Patents.

10. The ’980 Patent, entitled “Low-Density Parity-Check (LDPC) Code” was duly and lawfully issued on November 12, 2013. A true and correct copy of the ’980 Patent is attached hereto as Exhibit 1.

11. The ’212 Patent, entitled “Structured low-density parity-check (LDPC) code” was duly and lawfully issued on September 15, 2020. A true and correct copy of the ’212 Patent is attached hereto as Exhibit 2.

12. The ’856 Patent, entitled “Method, Apparatus, and Communications Interface for Sending and Receiving Data Blocks Associated With Different Multiple Access Techniques” was duly and lawfully issued on November 18, 2008. A true and correct copy of the ’856 Patent is attached hereto as Exhibit 3.

13. The ’260 Patent, entitled “Wireless Local Area Network Hotspot Registration Using Near Field Communications” was duly and lawfully issued on July 24, 2018. A true and correct copy of the ’260 Patent is attached hereto as Exhibit 4.

14. BlackBerry Corporation sent Sercomm a letter (addressed to the General Counsel of Sercomm Corporation), dated October 1, 2020, offering a license to BlackBerry patents, including the ’980 and ’212 Patents. BlackBerry’s letter identified exemplary products and services that Malikie believed infringed the ’980 and ’212 patents.

15. Malikie sent Sercomm a letter dated October 4, 2023 (addressed to the Vice President and General Counsel of Sercomm Corporation), offering a license to patents Malikie acquired from BlackBerry, including the ’980 and ’212 patents, and identifying exemplary products and services that BlackBerry believed infringed the ’980 and ’212 Patents.

16. On December 1, 2023, Malike sent Sercomm exemplary claim charts detailing, on an element-by-element basis, evidence of use of several of the Malikie patents identified in the October 4, 2023 letter.

17. On July 2, 2024, Malikie conducted a video call with Sercomm providing additional evidence of use. Later that same day, Malikie sent Sercomm a copy of the presentation.

18. More than fourteen months later, on October 22, 2025, Sercomm sent an email to Malikie requesting additional information. None of the requested information related to Malikie's July 2, 2024 presentation or the exemplary claim charts Malikie sent to Sercomm almost two years prior. Between November 2025 and March 2026, Malikie continued to reach out to Sercomm.

19. On May 24, 2026, Malikie provided Sercomm with global FRAND rates at which it offered to license patents relating to the Wi-Fi 802.11 and Wi-Fi Alliance standards.

20. Despite Malikie's numerous attempts to discuss licensing terms with Sercomm for close to three years, Sercomm has not obtained a license to Malikie's patent portfolio. Despite having been offered a FRAND rate at which to license Malikie's standard essential patents ("SEPs"), Sercomm has neither obtained a license to the SEPs nor provided an alternate rate. Malikie has therefore been left with no choice but to bring this action to enforce its rights as the owner of valid and valuable patents that Sercomm has infringed and, with respect to the '856 and '260 patents, continues to willfully infringe.

**<u>IEEE 802.11 STANDARDs AND PLAINTIFF'S FRAND OBLIGATIONS</u>**

21. The Institute of Electrical and Electronics Engineers ("IEEE") is a professional association that, among other activities, develops and publishes technical standards across a wide range of fields, including telecommunications and wireless communications.

22. The IEEE-Standards Association ("IEEE-SA") is the standards development organization within the IEEE responsible for developing and maintaining consensus-based standards in various industries, including the IEEE 802.11 family of wireless networking standards (commonly known as "Wi-Fi"). The IEEE 802.11 standards define specifications for the medium access control ("MAC") and physical ("PHY") layers to enable interoperable wireless local area network implementations. The IEEE-SA requires participants in its standards development process to comply with its patent policy, which governs the disclosure and licensing of patent rights that may be essential to the implementation of an IEEE standard. Participants are required to disclose the existence of patents or pending patent applications that they believe may contain claims essential or potentially essential to a proposed or approved standard. When such disclosure is made, the patent holder is requested to submit a Letter of Assurance ("LOA") stating whether it is willing to grant licenses to implementers of the relevant standard under terms that are fair, reasonable, and non-discriminatory ("FRAND"), consistent with the IEEE-SA patent policy.

23. BlackBerry participated actively in the IEEE standards development process, including the development of numerous standards within the 802.11 family. On multiple occasions, BlackBerry submitted public LOAs to the IEEE-SA stating that it may own patents containing Essential Patent Claims with respect to certain IEEE 802.11 standards, including the IEEE 802.11-2012, 802.11k, 802.11mb, 802.11n, 802.11p, 802.11r, 802.11s, 802.11u, 802.11v, 802.11w, 802.11y, 802.11z, 802.11aa, 802.11ad, and 802.11ae standards. In those LOAs, BlackBerry further indicated that it was willing to grant licenses under any patents containing Essential Patent Claims on terms that are FRAND.

24. The IEEE Patent Policy and FRAND framework make clear that FRAND negotiations require a reciprocal duty of the SEP holder (Submitter) and licensee (Applicant) to

engage in good faith negotiations without unreasonable delay, or alternatively, litigate. Section 6.2 of the current IEEE bylaws states:

> The Submitter and the Applicant should engage in good faith negotiations (if sought by either party) without unreasonable delay or may litigate … over patent validity, enforceability, essentiality, or infringement; Reasonable Rates or other licensing terms and conditions; compensation for unpaid past royalties or a future royalty rate… § 6.2.

25. As detailed above, BlackBerry and Malikie offered Sercomm the opportunity to license its SEPs, including those covering IEEE 802.11 standards. BlackBerry notified Sercomm of its infringement of the ’980 and ’212 Patents on October 1, 2020. Malikie notified Sercomm of its infringement of the ’980 and ’212 Patents on October 4, 2023 and the ’856 and ’260 Patents on January 2, 2026. On or about May 24, 2026, Malikie offered a specific FRAND royalty rate for all patents essential to the IEEE 802.11. As detailed above, Malikie has shared evidence of Sercomm’s infringement of Malikie’s SEPs and sought to discuss licensing proposals with Sercomm since October 4, 2023. Sercomm has not accepted Malikie’s proposed rate or counteroffered with a rate that it believes is FRAND.

## JURISDICTION AND VENUE

26. Plaintiffs incorporate by reference paragraphs 1-25 herein.

27. This civil action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285. Thus, this is a patent infringement lawsuit over which this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1332, and 1338(a).

28. This District has general and specific personal jurisdiction over Defendant because, directly or through intermediaries, Defendant has committed acts within this District giving rise to this action; transacts and conducts business, directly, and/or indirectly, in this District and the State of Texas; and transacts and conducts business with residents of this District and the State of Texas.

29. Defendant has infringed the Asserted Patents and continues to infringe the ’856 and ’260 Patents within this District and the State of Texas by making, using, selling, licensing, offering for sale, and/or importing in or into this District and elsewhere in the State of Texas, products and services covered by claims in the Asserted Patents, including without limitation products that, when made or used, practice the claimed methods of the Asserted Patents. Defendant, directly and through intermediaries, makes, uses, sells, licenses, offers for sale, imports, ships, distributes, advertises, promotes, and/or otherwise commercializes such infringing products and services in or into this District and the State of Texas. Defendant regularly conducts and solicits business in, engages in other persistent courses of conducts in, and/or derives substantial revenue from goods and services provided to residents of this District and the State of Texas.

30. Defendant is doing business, either directly or through respective agents, on an ongoing basis in this District and elsewhere in the United States and has committed acts of infringement in this district.

31. On information and belief, Defendant makes, uses, sells, offers to sells, and/or imports infringing products into and/or within this District, maintains a permanent and/or continuing presence within this District, and has the requisite minimum contacts with this District such that this venue is a fair and reasonable one. Upon information and belief, Defendant has transacted and, at the time of the filing of the Complaint, is continuing to transact business within this District.

32. Defendant purposefully directs or controls the sale of the accused products online and in nationwide retailers and wholesalers, including for sale in Texas and elsewhere in the United States, and expects and intends that the accused products will be so sold in this District. For example, the accused products are sold and/or offered for sale through T-Mobile, including at the T-Mobile store located at 1806 East End Boulevard North, Suite 100, Marshall, TX 75670. Defendant purposefully places the accused products—whether by itself or through subsidiaries, affiliates, or third parties—into an international supply chain, knowing that the accused products will be sold in the United States, including Texas and in this District. Therefore, Defendant also facilitates the sale of the accused products in Texas.

33. In particular, Defendant took active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, sell, or offer to sell the accused products in a manner that infringed the Asserted Patents and continues to infringe the ’856 and ’260 Patents. Such steps by Defendant included, among other things, making or selling the accused products outside of the United States for importation into and/or sale in the United States, or knowing that such importation or sale would occur; and directing, facilitating, or influencing their affiliates, or third-party manufacturers, shippers, distributors, retailers, or other persons acting on its or its affiliates’ behalf, to import, sell, and/or offer to sell the accused products in an infringing manner.

34. Defendant and its affiliates utilize established distribution channels to distribute, market, offer for sale, sell, service, and warrant infringing products directly to consumers and other users in the U.S. Such a presence furthers the development, design, manufacture, importation, distribution, sale, and use (including by inducement) of infringing products in Texas, including in this District. For example, Defendant designs and manufactures routers and gateways provided

by Spectrum to its Internet customers in Marshall, TX: https://www.highspeedinternet.com/resources/spectrum-wifi-now-includes-backup (last visited August 7, 2026); *see also* https://www.spectrum.com/locations/tx/marshall (listing Spectrum as an Internet Provider in Marshall, Texas) (last visited August 7, 2026). As another example, Defendant designs and manufactures routers and gateways provided by T-Mobile to its Internet customers in Marshall, TX: https://www.t-mobile.com/support/home-internet/5g-gateway-g4ar (last visited August 7, 2026); https://web.archive.org/web/20240211050913/https://www.t-mobile.com/support/home-internet/5g-gateway-g4ar (Feb. 11, 2024); *see also* https://broadbandnow.com/Texas/Marshall (listing T-Mobile as an Internet Provider in Marshall, Texas) (last visited August 7, 2026). Plaintiffs' causes of action arise, at least in part, from Defendant's contacts with and activities in and/or directed to this District and the State of Texas.

35. This Court has personal jurisdiction over Defendant pursuant to Tex. Civ. Prac. & Rem. Code § 17.041 et seq., the Texas Long Arm Statute.

36. Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) because, among other things, Sercomm is a foreign corporation defendant not resident in the United States and thus may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3); *In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018).

37. Sercomm is doing business, either directly or through respective agents, subsidiaries, or intermediaries, on an ongoing basis in this District and elsewhere in the United States and has committed acts of infringement in this District.

38. Sercomm is subject to this Court's jurisdiction pursuant to due process and the Texas Long Arm Statute due at least to its substantial business activities in this State and District, including (a) its past and present infringing activities, (b) regularly doing or soliciting business in

Texas, and/or (c) engaging in persistent conduct and/or deriving substantial revenue from goods or services, including hardware, software, or support related goods or services, provided to customers in Texas.

## FIRST CLAIM

### (Infringement of the ’980 Patent)

39. Plaintiffs re-allege and incorporate herein by reference paragraphs 1-38 of their Complaint.

40. The ’980 Patent is generally directed to constructing a low-density parity-check (LDPC) code using a structured parity check matrix and expanding the base parity check matrix into an expanded parity check matrix.

41. The ’980 Patent provides improvements to an existing technological process (e.g., encoding and decoding LDPC data) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the Specification identifies problems in conventional systems that were “faced by the designer of LDPC codes” including “the parity part of the base parity check matrix does not allow simple encoding algorithm. Another problem is that row weight is not uniform or not close to uniform. Therefore, there is an unmet need for LDPC codes for use in modern communication systems.” Exhibit 1 (’980 Patent) at 2:11-14. The ’980 Patent addressed these problems through improvements in providing expanded parity check matrices to be applied to encoded data to decode LDPC data and further, to be applied to data to generate encoded data. The expanded parity check matrix is expanded “by replacing each non-zero element by a shifted identity matrix; and replacing each zero element of the plurality of elements by a zero matrix.” *Id.* at 2:27-30.

42. The ’980 Patent provides numerous technical advantages. For example, the ’980 Patent accommodates “larger code rates without redesigning parity check matrix and therefore avoiding changing significantly base hardware wiring, expansion of a base parity check matrix is one of the common approaches. This may be achieved, for example, by replacing each non-zero element by a permutation matrix of the size of the expansion factor.” *Id.* at 2:4-10. The ’980 Patent further provides “[e]fficient decoder architectures … by designing the parity check matrix, which in turn defines the LDPC code, around some structural assumptions: structured LDPC codes … LDPC parity check matrix design also results in the reduction in encoder complexity.” *Id.* at 7:54-55, 8:18-19.

43. Defendant has been on notice of the ’980 Patent and a specific factual basis for its infringement of the ’980 Patent since at least since October 1, 2020.

44. Defendant has, under 35 U.S.C. § 271(a), directly infringed, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 32 of the ’980 Patent, by having made, used, tested, sold, offered for sale, and/or imported hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the ’980 Patent), such as any of Defendant’s products implementing LDPC, such as Sercomm G5SE, G4SE, and SBE1V1R as identified in Exhibit 5. An exemplary claim chart showing one way in which Defendant infringed claims 1 and 32 of the ’980 Patent is attached as Exhibit 5.

45. Defendant has also indirectly infringed the ’980 Patent under 35 U.S.C. § 271(b) and (c).

46. Defendant has knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claims 1 and 32 of the ’980 Patent by, for example, having sold

and offered access to devices compliant with IEEE 802.11 standards. Defendant knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claims 1 and 32 of the ’980 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the infringing products. Defendant, for example, provided instructions on how to access and use the infringing Wi-Fi features. *See* Exhibit 5; *see also, e.g.*, https://web.archive.org/web/20240211050913/https://www.t-mobile.com/support/home-internet/5g-gateway-g4ar (Feb. 11, 2024); https://www.t-mobile.com/support/home-internet/5g-gateway-g4ar.

47. Defendant also contributed to the direct infringement of at least claims 1 and 32 of the ’980 Patent under 35 U.S.C. § 271(c) by, for example, having supplied, with knowledge of the ’980 Patent, a material part of a claimed invention, where the material part was not a staple article of commerce and was incapable of substantial noninfringing use. For example, Defendant provided, owned, operated, sold, offered to sell, and/or imported devices compliant with IEEE 802.11 standards (such as that shown in Exhibit 5) that were not a staple article of commerce and were incapable of substantial non-infringing use.

48. Defendant’s infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## SECOND CLAIM

### (Infringement of the ’212 Patent)

49. Plaintiffs re-allege and incorporate herein by reference paragraphs 1-48 of their Complaint.

50. The ’212 Patent is generally directed to constructing a low-density parity-check (LDPC) code using a structured parity check matrix and expanding the base parity check matrix into an expanded parity check matrix.

51. The ’212 Patent provides improvements to an existing technological process (e.g., encoding and decoding LDPC data) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the Specification identifies problems in conventional systems that were “faced by the designer of LDPC codes” including “that the base parity check matrices are designed to follow some assumed degree distribution, which is defined as the distribution of column weights of the parity check matrix. Column weight in turn equals the number of [non-zero elements] in a column.” Exhibit 2 (’212 Patent) at 2:20-23. The ’212 Patent further indicates that “existing approaches for shortening and puncturing of the expanded matrices may preserve the column weight distribution, but may severely disturb the row weight distribution of the original matrix. This, in turn, causes degradation when common iterative decoding algorithms are used. This adverse effect strongly depends on the structure of the expanded matrix.” *Id.* at 2:53-59. The ’212 Patent addressed these problems through improvements disclosed in claims 13 and 20 of providing the correct balance of orthogonal frequency-division multiplexing (OFDM) symbols for transmitting the data, shortening bits, and puncturing bits.

52. The ’212 Patent provides numerous technical advantages. For example, the ’212 Patent accommodates “larger code rates without redesigning parity check matrix and therefore avoiding changing significantly base hardware wiring, expansion of a base parity check matrix is one of the common approaches. This may be achieved, for example, by replacing each non-zero element by a permutation matrix of the size of the expansion factor.” *Id.* at 2:12-18. The ’212

Patent further provides "[e]fficient decoder architectures … by designing the parity check matrix, which in turn defines the LDPC code, around some structural assumptions: structured LDPC codes … LDPC parity check matrix design also results in the reduction in encoder complexity." *Id.* at 8:4-7, 8:33-35. As another example, it is desirable to maintain a performance criterion when encoding data using LDPC and transmitting encoded data. *Id.* at 2:35-36. Coding gain is an example of a performance criterion, which is understood to be a measure of the difference between the signal-to-noise ratio levels between the uncoded system and coded system required to reach the same bit error rate levels when used with the error correcting code. Further, maintaining a desired coding gain is understood to involve reducing the signal power required by a device when transmitting data without compromising data integrity. However, while maintaining a high coding gain is desirable, it can also require increased computational complexity. This may increase the decoding iterations and greater processor power may be required. The '212 Patent explains that "in order to maintain the performance such as coding gain as high as possible, there are different requirements such as to select the largest suitable codeword from the available set of codewords and then properly adjust the amount of shortening and puncturing; use as few of the modulated symbols as possible; and keep the overall complexity at a reasonable level." *Id.* at 2:35-42. The '212 Patent also described other problems that existed in the field at the time of the priority date of the '212 Patent, including inefficient use of processing power and power used to transmit data. *Id.* at 8:18-22. The '212 Patent addressed those problems by encoding data to be transmitted using LDPC encoding. For example, the '212 Patent explains: "For the LDPC codes and other block codes, the longer the codeword the more coding gain can be achieved, although at certain codeword size the point of diminishing return is reached. Adjust properly the amount of shortening and puncturing, as this directly affects the performance, and the efficiency of the transmission."

*Id.* at 19:55-59. The ’212 Patent further discloses an objective to use as few “of the modulated symbols as possible” to “utilize transmit power economically.” *Id.* at 19:63-35. And further, to keep the overall computational complexity at a reasonable level “operate with a relatively small set of codewords in different sizes.” *Id.* at 20:1-3.

53. Defendant has been on notice of the ’212 Patent and a specific factual basis for its infringement of the ’980 Patent since at least since October 1, 2020.

54. Defendant has, under 35 U.S.C. § 271(a), directly infringed, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 13 and 20 of the ’212 Patent, by having made, used, tested, sold, offered for sale, and/or imported hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the ’212 Patent), such as any of Defendant’s products implementing LDPC, such as Sercomm G5SE, G4SE, and SBE1V1R as identified in Exhibit 6. An exemplary claim chart showing one way in which Defendant infringed claims 13 and 20 of the ’212 Patent is attached as Exhibit 6.

55. Defendant has also indirectly infringed the ’212 Patent under 35 U.S.C. § 271(b) and (c).

56. Defendant has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claims 13 and 20 of the ’212 Patent by, for example, having sold and offered access to devices compliant with IEEE 802.11 standards. Defendant knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claims 13 and 20 of the ’212 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the infringing products. Defendant, for example, provided instructions on how to access and use the infringing Wi-Fi features. *See* Exhibit 6; *see also, e.g.*,

https://web.archive.org/web/20240211050913/https://www.t-mobile.com/support/home-internet/5g-gateway-g4ar (Feb. 11, 2024); https://www.t-mobile.com/support/home-internet/5g-gateway-g4ar.

57. Defendant also contributed to the direct infringement of at least claims 13 and 20 of the ’212 Patent under 35 U.S.C. § 271(c) by, for example, having supplied, with knowledge of the ’212 Patent, a material part of a claimed invention, where the material part was not a staple article of commerce and was incapable of substantial noninfringing use. For example, Defendant provided, owned, operated, sold, offered to sell, and/or imported devices compliant with IEEE 802.11 standards (such as that shown in Exhibit 6) that were not a staple article of commerce and were incapable of substantial non-infringing use.

58. Defendant’s infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

**THIRD CLAIM**

**(Infringement of the ’856 Patent)**

59. Plaintiffs re-allege and incorporate herein by reference paragraphs 1-58 of their Complaint.

60. The ’856 Patent is generally directed to “unified and flexible signaling method and radio interface accommodate different multiple access schemes.” Exhibit 3 (’856 Patent) at Abstract.

61. The ’856 Patent includes improvements to an existing technological process (e.g., multiple access schemes) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the specification indicates that in conventional

systems given the "wide range of application and deployment scenarios expected in 4G with bandwidth requirements exceeding of 100 MHz, it is unlikely that a single multiple access technique with fixed bandwidth can well serve all scenarios. Past experience also suggests that lengthy standardization processes eventually lead to a compromise that accommodates multiple solutions. Therefore, it is important to design an air interface in which a mixture of multiple access schemes can be accommodated within an entire wideband channel. Although the ITU's IMT-2000 standard encompasses three different "modes", namely, UMTS FDD, UMTS TDD and CDMA 2000, they are effectively three distinct multiple access approaches that are very difficult to integrate. Nor does the IMT-2000 standard permit combining frequency domain approaches such as OFDM and OFCDM with time domain/code domain schemes like DS-CDMA." *Id.* at 1:60-2:8. The '856 Patent addresses these issues by providing "a unified and flexible signaling method and radio interface that accommodates different multiple access schemes." *Id.* at 2:9-11. The '856 Patent provides numerous technical advantages. For example, the '856 Patent states "[w]hen operated adaptively with suitable control signaling, the overall communication network performance and robustness can be greatly improved by dynamically selecting the most suitable multiple access schemes according to factors such as channel condition, equipment preference, and service requirements, etc." *Id.* at 10:62-67.

62. Defendant has been on notice of the '856 Patent and a specific factual basis for its infringement of the '856 Patent since at least January 2, 2026.

63. Defendant has, under 35 U.S.C. § 271(a), directly infringed, and continues to do so, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 14 of the '856 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including devices compliant with IEEE 802.11

standards (excluding any products licensed under the ’856 Patent), such as any of Defendant’s products implementing multiple access schemes, such as Sercomm G5SE, G4SE, and SBE1V1R, as identified in Exhibit 7. An exemplary claim chart showing one way in which Defendant infringes claims 1 and 14 of the ’856 Patent is attached as Exhibit 7.

64. Defendant has also indirectly infringed, and continues to indirectly infringe, the ’856 Patent under 35 U.S.C. § 271(b) and (c).

65. Defendant has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claims 1 and 14 of the ’856 Patent, and continue to do so, by, for example, selling and offering access to devices compliant with IEEE 802.11 standards. Defendant knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claims 1 and 14 of the ’856 Patent, and continues to do so, by, for example, selling, offering for sale, and encouraging customers to use at least some or all of the infringing products. Defendant, for example, provides instructions on how to access and use the infringing Wi-Fi features. *See* https://www.t-mobile.com/support/home-internet/5g-gateway-g4ar; *see also* Exhibit 7.

66. Defendant also contributed to the direct infringement, and continues to do so, of at least claims 1 and 14 of the ’856 Patent under 35 U.S.C. § 271(c), and continues to do so, by, for example, supplying, with knowledge of the ’856 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provides, owns, operates, sells, offers to sell, and/or imports devices compliant with IEEE 802.11 standards (such as that shown in Exhibit 7) that are not a staple article of commerce and are incapable of substantial non-infringing use.

67. Defendant's ongoing infringement is willful in view of the above and their failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

**FOURTH CLAIM**

**(Infringement of the '260 Patent)**

68. Plaintiffs re-allege and incorporate herein by reference paragraphs 1-67 of their Complaint.

69. The '260 Patent is generally directed to registering a wireless device with access points in wireless network environments.

70. The '260 Patent includes improvements to an existing technological process (e.g., registering with access points in wireless networks) and improvements to the performance of a computer system (e.g., a wireless communication system). For example, conventionally, "[t]he experience associated with these techniques or standards for registering a wireless device to a local network or external network via an access point … can be quite frustrating to a user" because it involved "user involvement typically through the use of a user interface to register a wireless device with an external network" prior to visiting the network or when the wireless device comes within communication range of the network. Exhibit 4 ('260 Patent) at 1:46-51. The '260 Patent addresses these issues by "transmitting/receiving a trigger message to/from a second device based on wireless short-range communication. The trigger message initiates a registration process within a wireless local area network (WLAN)." *Id*. at Abstract.

71. Furthermore, the '260 Patent solved the problem associated with requiring manual "input registration information such as credentials, wireless device information, personal information (e.g., name and postal address), payment information (e.g., credit card number,

account number, pre-paid account number, coupon number, etc.), terms and conditions acceptance, etc. using a user-input interface or display on the wireless device." *Id.* at 2:58-65. For example, the '260 Patent teaches the wireless device can "'trigger' (i.e., initiate or prompt) the automatic registration of a wireless device with an external network through a WLAN hotspot without requiring a user of the wireless device to manually input or provide registration information via the wireless device." *Id.* at 3:12-16. Further, claim 12 states "wherein the first message automatically initiates a registration process with an access point (AP) of a wireless local area network (WLAN) associated with the first wireless device." *Id.* at 18:17-20.

72. Defendant has been on notice of the '260 Patent and a specific factual basis for its infringement of the '260 Patent since at least January 2, 2026.

73. Defendant has, under 35 U.S.C. § 271(a), directly infringed, and continues to do so, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 12 of the '260 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the '260 Patent), such as any of Defendant's products implementing registering for external networks, such as Sercomm G5SE and SBE1V1R as identified in Exhibit 8. An exemplary claim chart showing one way in which Defendant infringes clam 12 of the '260 Patent is attached as Exhibit 8.

74. Defendant has also indirectly infringed, and continues to indirectly infringe, the '260 Patent under 35 U.S.C. § 271(b) and (c).

75. Defendant has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 12 of the '260 Patent, and continues to do so, by, for example, selling and offering access to devices compliant with IEEE 802.11 standards. Defendant

knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claim 12 of the ’260 Patent, and continues to do so, by, for example, selling, offering for sale, and encouraging customers to use at least some or all of the infringing products. Defendant, for example, provides instructions on how to access and use the infringing Wi-Fi features. *See* https://www.t-mobile.com/support/home-internet/5g-gateway-g5; *see also* Exhibit 8.

76. Defendant also contributed to the direct infringement of at least claim 12 of the ’260 Patent under 35 U.S.C. § 271(c), and continues to do so, by, for example, supplying, with knowledge of the ’260 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provides, owns, operates, sells, offers to sell, and/or imports devices compliant with IEEE 802.11 standards (such as that shown in Exhibit 8) that are not a staple article of commerce and are incapable of substantial non-infringing use.

77. Defendant’s infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## **PRAYER FOR RELIEF**

WHEREFORE, Malikie and KPI pray for judgment against Sercomm as follows:

78. That Sercomm has infringed each of the Asserted Patents and will continue to infringe the ’856 and ’260 Patents unless enjoined;

A. That Sercomm’s infringement of the Asserted Patents has been willful;

B. That Sercomm pay Malikie and KPI damages adequate to compensate for its past infringement of each of the Asserted Patents, and present and future infringement of the ’856 and ’260 Patents, together with interest and costs under 35 U.S.C. § 284;

C. That Sercomm pay prejudgment and post-judgment interest on the damages assessed;

D. That Sercomm pay Malikie and KPI enhanced damages pursuant to 35 U.S.C. § 284;

E. That Sercomm be ordered to pay ongoing royalties to Malikie and KPI for any post-judgment infringement of the ’856 and ’260 Patents;

F. That this is an exceptional case under 35 U.S.C. § 285; and that Sercomm pay Malikie and KPI’s attorneys’ fees and costs in this action; and

G. That Malikie and KPI be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Malikie and KPI hereby demand a trial by jury on all issues triable to a jury.

Respectfully submitted,

*/s/ Patrick Colsher by permission Claire Abernathy Henry*

Patrick Colsher – LEAD ATTORNEY
Khue V. Hoang
Reichman Jorgensen Lehman & Feldberg LLP
650 Fifth Avenue, Suite 2320
New York, NY 10019
Tel: (212) 381-1965
pcolsher@reichmanjorgensen.com
khoang@reichmanjorgensen.com

Matthew G. Berkowitz
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
mberkowitz@reichmanjorgensen.com

Naveed Hasan
Reichman Jorgensen Lehman & Feldberg LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 894-7310
nhasan@reichmanjorgensen.com

Of Counsel:

Claire Abernathy Henry
Texas State Bar No. 24053063
MILLER FAIR HENRY PLLC
1507 Bill Owens Pkwy. Longview, TX 75604
Tel: (903) 757-6400
claire@millerfairhenry.com

*Attorneys for Plaintiffs Malikie Innovations Ltd. and Key Patent Innovations Ltd.*